Parker, C. J.,
delivered the opinion of the Court. (After a brief recital of the facts from the report of the judge who sat at the trial.) A new trial is now moved for, on the ground, that the process under which the defendant justified, and which was rejected by the judge, ought to have been admitted in evidence, and that the facts set forth in the brief statement form a good and sufficient defence to the action.
Several exceptions were taken at the trial to the evidence offered, all of which were ruled in favor of the plaintiff; and, if any of them should now be deemed substantial, the verdict must stand, because one *275 alone would be a rightful cause for withholding the evidence from the jury, and without that evidence no defence could be pretended.
It may be well to consider the objections in the order in which they stand in the report of the judge ; which order has been observed in the argument. Much learning and research have been displayed by the counsel, on some of the points ; and more time would be necessary to form an opinion of the effect of their reasoning than we can now devote to the subject, if we were not satisfied that a much wider range has been taken than the cause requires ; most of the questions depending, as we think, upon a true and * fair construction of our own statutes providing for the due observation of the Lord’s day. We shall, however, notice all the points which have been the subject of the argument; because there seems to be some public interest taken in the question, and because it is proper that the law should be known, in order that magistrates and executive officers may conform to it; and that the legislature may make new provisions, if those now existing should be found deficient.
The first point ruled by the judge at the trial was, that E. Parsons, Esq., the justice of the peace who received the complaint and issued the warrant, had no lawful jurisdiction of the case ; because, being one of the inhabitants of Belchertown, to whose use, by the statute of 1796, c. 89, one moiety of the penalty to be recovered was to be applied, he was interested in the prosecution, and could not, therefore, sit as judge.
It is very certain, that, by the principles of natural justice, of the common law, and of our constitution, no man can lawfully sit as judge in a cause in which he may have a pecuniary interest. Nor does it make any difference, that the interest appears to be trifling ; for the minds of men are so differently affecte.d by the same degrees of interest that it has been found impossible to draw a satisfactory line. Any interest, therefore, however small, has been held' sufficient to render a judge incompetent. The only exception known, to this broad and general rule, exists where there may be a necessity that the person so interested should act, in order to prevent a failure in the administration of justice, according to the case cited from 5 Mass. Rep. 90. But in the case before us there was no necessity ; as every justice of the peace within the county had jurisdiction over the subject-matter; and none but such as were inhabitants of Belchertown had any- interest in the recovery of the penalty.
In the case of Hesketh vs. Braddock, cited by Mr. Bliss, the interest imputable to the jurors, and the officer who * returned them, was similar to that which the magistrate had in the case before us. The prosecution was for a penalty, which was to be recovered for the use of the corporation, *276 of which they were members ; and the whole penalty was only £ 5. But the Court of King’s Bench, for this cause, quashed the proceedings of the inferior tribunal; and Lord Mansfield said ; “ There is no principle in the law more settled than this, that any degree, even the smallest degree, of interest in the question depending is a decisive objection to a witness, and much more so to a juror, or to the officer by whom the juror is returned ; and that the minuteness of the interest will not relax the objection ; for the degrees of influence cannot be measured ; no line can be drawn, but that of a total exclusion ol all degrees whatever.”
It is true, he does not comprehend a judge or magistrate within this general exclusion on account of interest. But there can be no doubt, that the principle applies with equal strength to them ; especially to a magistrate exercising the authority both of judge and jury, as those do who have cognizance of suits criminal and civil, according to our statutes.
Our legislature may also be considered as having recently sanctioned the same principle ; for, since this cause was tried, and after the decision of the judge upon this point was made known, they have, with a view to avoid this difficulty, made an appropriation of the penalties which takes away the interest of inhabitants of towns, and thus all justices are placed upon an equal footing ; so that, hereafter, within the reason of the case of the Commonwealth vs. Ryan, the jurisdiction of a justice of the peace, living in the town within which the offence may be committed, may well be maintained.
We think, that, for this cause, any judgment rendered by the justice, thus circumstanced, might be defeated. But, as the interest of a justice who issues a warrant may be latent and unknown to the officer who is called upon to * serve it, we are not prepared to say that he may not be protected against any suit for damages ; and, although in this case it appeared on the face of the warrant, that the magistrate lived in the town of Belchertown, as well as the complainant and the constable ; we still avoid deciding, that, for this cause, the proceedings were wholly void, so as to make the officer a trespasser. For it may be, that the justice might lawfully receive a complaint, and issue his warrant, although he could not lawfully sit as judge ; those acts, perhaps, being ministerial in their nature, and warrants being generally made returnable to any justice of the peace within the county.
The second point ruled by the judge was, that a justice of the peace had no jurisdiction of this cause ; because the person complained of was, at the time, an inhabitant of a different county from that in which the alleged offence was committed. And, after a careful examination of the statutes, we are all satisfied, that in this opinion the judge was correct. Indeed, it seems difficult to raise a question *277 upon this point; but, as it has been much labored in argument, we proceed to discuss it.
The tenth section of the statute of 1791, c. 58, provides, that the tythingman, who shall not be satisfied with the excuse offered by any person whom he shall suspect of unnecessarily travelling on the Lord’s day, “ shall enter a complaint against the person travelling, before a justice of the peace in the county where the offence is committed, if such person lives in such county ; otherwise, shall give information to some grand juryman, to be by him laid before the grand jury, for their consideration and presentment.” In the thirteenth section of the same statute it is provided, “that all said offences, the penalties against which exceed forty shillings, shall be prosecuted, by presentment of the grand jury, before the Court of General Sessions of the Peace, in the county where the offence may be committed. But all offences, the penalty whereof does not exceed forty shillings (except the offender * lives out of the county in which the offence may be committed), shall be prosecuted by complaint before a justice of the peace in such county ; but, when the offender lives out of such county, he may be presented as aforesaid, although the penalty does not exceed forty shillings.” It is impossible to imagine terms more indicative of an unequivocal exclusion of a justice’s jurisdiction over a person not living within the county, than those used by the legislature, as above quoted.
It certainly requires a very refined and ingenious talent of construction, to make any other meaning in the least degree probable But this has been attempted in the following way ; —
First, it is said, that the jurisdiction of the justice and that of the Court of Sessions are concurrent, and that the complainant may elect either of these tribunals ; and this, because, in the latter branch of the thirteenth section, the words are, “if the offender lives out of the county, he may be prosecuted by presentment,” &c. But this is taking one branch of a sentence by itself, and giving it an independent meaning, although contradictory to other clear expressions in the same sentence ; contrary to every rule of construction. Besides, it is manifest, that, without the latter provision, offences committed by persons living without the county would be left wholly without punishment. For, the justice’s jurisdiction having before been utterly excluded in express terms, if this last sentence had been omitted there would have been no mode provided for the recovery of penalties in such cases.
It has been also said, that the intention of the legislature was, to confine the jurisdiction of justices to persons apprehended within the county ; so that the words, living within the county, in the statute, mean nothing more than being within the county. But this is doing *278 violence to language, and straining for a meaning, when no doubt or ambiguity exists in the words of the act itself. Courts may give a sensible and reasonable interpretation to legislative * expressions which are obscure; but they have no right to distort those which are clear and intelligible
The statute of 1796, c. 89, has been confidently relied upon, as explanatory of the sense of the legislature upon this subject, or as providing anew for the recovery of all penalties on a complaint to a ■justice of the peace.
This act is merely auxiliary to that which we have been considering, being expressly made in addition to it, and repealing no part of it. Its principal objects were, to increase the penalties, and to make a different appropriation of them. Having provided for these objects, the second section enacts, that the penalties may be recovered, to the uses therein declared, by a complaint to a justice of the peace, or by presentment of the grand jury. There is no non obstante of any preexisting laws, nor any express repeal of the former provisions for prosecutions. Certainly no implication of such repeal necessarily results ; for it is reasonable to suppose, that the modes of recovery here prescribed have reference to the cases which were before provided for; and that nothing more was intended than that these new penalties should be recovered in the same manner as had been provided for the former, reddendo singula singulis.
It cannot be imagined, that provisions, made with so much care, distributing jurisdiction according to the nature of particular cases, were intended to be annulled by words which may, at least, as well be construed to affirm and strengthen the preexisting mode of recovery.
We are all of opinion, that the justice of the peace, who issued the warrant under which the defendant would justify, had no jurisdiction over the person of the plaintiff; because he did not live in the county, wherein the alleged offence was committed. And, as this defect appears on the face of the warrant, the officer was not obliged to serve it ; and in doing so he became a trespasser.
The papers offered in evidence were, therefore, rightfully rejected ; and we might be spared the trouble of * considering the remaining point in the cause. But, for the reason suggested in the beginning of this opinion, we proceed to discuss it.
The third point ruled by the judge at the trial was, “ that a justice of the peace had no authority, on the Sabbath, to receive a complaint and issue a warrant for the violation of the acts for the due observation of the Lord’s day, unless such violation was accompanied by some act of violence, disturbing the peace and public tranquillity ; and that the defendant had no authority to arrest the plaintiff, im a warrant so issued, on the Lord’s day.”
*279 It is this part of the cause, which has given occasion for the researches, which have been so diligently made, into the ancient common law, acts of Parliament, reported decisions, and the colonial and provincial ordinances and acts ; the labor bestowed upon which we think in a great measure fruitless, as our own statutes have entirely superseded all preexisting regulations upon the subject.
The opening counsel for the defendant endeavoured to establish the position, which no one denies, that it is unlawful to travel or labor on Sunday ; by proving the divine appointment of that day as holy time, in which no manner of work was to be done. His argument was founded principally upon scriptural and other authorities, which prove the divine institution of the Jewish Sabbath. Certainly it is not necessary to resort to the laws promulgated by Moses, in order to prove that the Christian Sabbath ought to be observed by Christians, as a day of holy rest and religious worship ; and, if it were, it would be difficult to make out the point contended for, from that source.
It is true, that from the fourth command in the Decalogue it may be inferred, that one day in seven was, according to the divine will, to be set apart as a day of rest from labor. But none will contend, that the day therein sanctified is the day which Christians are bound , to keep as holy time ; or that any of the rigid laws of Moses relative to the observance of that day are now in force. It is enough to * observe, that, by the universal consent of Christians, another holy day has been substituted, and that works of necessity and charity are not profanations of the Christian Sabbath ; so that a poor man, in these days, would not be stoned to death for gathering sticks on the Sabbath, although that was the punishment inflicted in the time of Moses, (33) and although some among our ancestors so far regarded the laws of Moses as of perpetual obligation, as to propose for their code the punishment of death for the crime of disregarding or carelessly observing the Sabbath. (34)
All arguments drawn from the Jewish law respecting the Sabbath are, therefore, out of place ; except so far as any provisions of that law may have been recognized and promulgated by our Saviour, or by the legislative authority of our own Commonwealth. We are not aware that there is upon record any express precept of our Saviour, or of his Apostles, enjoining the observance of one day as more holy than others ; and yet we are far from questioning the religious obligation which all Christians are under to separate to religious uses the first day of the week ; since that is the time which, from the days of the Apostles, was set apart for that purpose, and since the legisla *280 live power or the uniform usage of every Christian state has exacted the observance of it as such.
Indeed, if this argument, founded on the Jewish law, could prevail, we are at a loss to perceive how the defence set up in this case could be aided by it. For, if all work and labor be unlawful, surely the mere secular work of holding a court, or arresting a supposed offender, must be within the general prohibition. Nor would these labors form so meritorious an exception as many works of charity which are permitted to be done on the Christian Sabbath.
The ground taken by the other counsel for the defendant differs altogether from this. For he contends, that, by the com mon law of England, and of this State, judicial * matters, touching offences committed, may by law be transacted on Sunday ; at least, so far as relates to the arrest and trial of persons accused of crimes.
By the common law of England, it is certain, that Sunday is esteemed dies non juridicws; and that any order, sentence, decree, or judgment, of any court, rendered on that day, would be void. This seems to be clearly settled in the case of Swann vs. Broome, which was cited in the argument for the plaintiff, and in which Lord Mansfield, gives an historical account of Sunday, and proves that no judicial proceedings had on that day can be valid.
Ministerial acts, however, relating to the administration of justice,used to be done on Sunday, and probably to an inconvenient degree. For, by the statute of 29 Car. 2, c. 7, the service of all processes, warrants, orders, &c., on Sunday, are made unlawful, except for treason, felony, or breach of the peace. Whether arrests of persons «charged with misdemeanours would come fairly within this exception may be questionable. But it was determined by the courts, that any offence which subjected the party to an indictment was constructively a breach of the peace ; and thus persons accused of perjury, forgery, blasphemy, &c., which are neither treason, felony, nor breach of the peace, might probably be arrested on Sunday.
But by our statute the service of none but civil process is prohibited on the Lord’s day ; so that warrants against persons charged with any crimes whatever may be lawfully served on that day. Warrants may also be issued ; for, if the arrest is authorized by law, the order to make such arrest must likewise be lawful. But magistrates and executive officers will undoubtedly use this power with discretion, and with due regard to the sacredness of the day ; so that it may not be profaned or disturbed by this exercise of their authority, except in cases of emergency, when justice might otherwise be evaded. They will also undoubtedly consider, that all unnecessary official labor will * expose them to the penal *281 ties of the act for the due observation of the Lord’s day, although their doings may not be void.
It is not, therefore, on any general prohibition of judicial or magisterial acts on the Lord’s day that we found our opinion of the unlawfulness of the proceedings of the justice in this particular case ; but altogether upon the statute of 1791, c. 58, before cited ; from a careful perusal of which, and a comparison of it with the statute of 1782, c. 23, commonly called the Warden Act, which was superseded by it, we think it will manifestly appear that the legislature did not intend that prosecutions for the violation of this law should be attended to on the Lord’s day.
It would certainly seem extraordinary, that a statute, enacted for the sole object of insuring reverence and respect for one day of the week, in order that religious exercises should be performed without interruption from common and secular employments, should authorize acts which, from their necessary publicity, would be likely to cause more disturbance to devout people than all the irregularities intended to be cured. This, however, would inevitably be the effect, if justices might keep open their courts, to receive complaints and issue warrants, and travellers might be arrested in the highway and forcibly carried before the magistrate. If a trial is to be had, the accused has a right to have his witnesses summoned, his counsel to assist in his defence ; and he may have occasion to summon pious persons, who are engaged in public or private worship, to testify in his behalf. Surely, one such scene as this would do more towards injuring the public morals, and impairing a respect for the Lord’s day, than the travelling of many people peaceably and quietly through a town, perhaps unnoticed by any but the officers whose duty it is made to complain of such a breach of the law.
The answer suggested to this difficulty is, that there is no necessity for trying the accused until the day following. But the warrant requires, that the party shall be forthwith * brought before the justice ; and we think it would be a violation of the constitutional privileges of the citizen, that he should be seized upon the road, and kept in custody twenty-four hours, on the suspicion of having committed an offence, if he should insist upon an immediate examination. In some cases, too, when a person might be actually travelling upon some necessary, just, or charitable object, the whole purpose of his journey might be frustrated by the delay.
Nor will it do to say, that tythingmen will be reasonable and candid, and will always suffer the traveller to pass, if he gives a sufficient excuse. As to many of them, such will undoubtedly be the case. But, unless their office exempts them from the common frailties of humanity, there may be some whose zeal will lead them to doubt of any excuse which may be offered, and render them incom *282 petent to decide fairly on the grounds and causes alleged in excuse or justification of an apparent breach of the law.
But to look more particularly into the statute, and compare it with that of 1782, which it was intended to supersede.
By the latter, the wardens were expressly empowered to stop and detain the traveller, without any warrant, until a trial could be had. By the statute now in force, the tythingman is authorized only to examine the traveller, as to his name, place of abode, and the cause of his travelling ; no power being given to stop or detain. It will be seen, by examining the two statutes, that they are in all respects substantially alike, except in this point o'f stopping or detaining. Indeed, the authority given to the tythingman to examine is copied almost verbatim from a section in the statute of 1782, giving the like authority to wardens. The section, in that act, giving power to stop and detain, is an independent provision, and is wholly omitted in the statute of 1791. This could not have been accidental; but resulted, undoubtedly, from the conviction of the legislature, that the exercise of such a power was inconvenient * and mischievous. Indeed, all who are old enough will remember that the Warden Act was complained of, as giving arbitrary and unconstitutional power to individuals over the persons of their fellow-citizens. With this provision before their eyes, and the complaint fairly stated to them, is it probable that the legislature intended, that what had been done under their authority by one officer, and the power to do which had been found inexpedient, should be done by the intervention of a justice of the peace, without making an express provision for that purpose ?
We think that no such inference can be fairly drawn ; but that the legislature deemed it best to suffer the traveller to pass, if he chose, after examination, and to punish him afterwards by a prosecution for the penalty.
Why, also, it may be asked, was it so carefully provided in the statute, that the traveller should be prosecuted by presentment, if not living within the county where he should be found travelling ? He is found within the county, and the fact is committed there ; which is enough, in ordinary cases, to give jurisdiction to the justice. It could only be, because he could not be stopped by warrant or otherwise, while travelling, and so might have escaped punishment, if the provision had not been made. We think this provision of the act decisive evidence that it was not intended to be executed on Sunday.
Further, it is manifest, that, by the statute, the penalty is incurred, not for travelling on the Lord’s day, but for unnecessary travelling ; the statute being predicated upon the reasonable supposition, that persons might be led, from motives of duty, to undertake or continue *283 a journey on that day. It was not intended to execute the law by previous restraint, but by subsequent punishment; and, indeed, this is the only way in which the whole intent of the legislature can be carried into effect.
Cases may often occur in which it will be both innocent and laudable for the most exemplary citizen to travel on Sunday. Suppose him suddenly called to visit a * child, or other near relative, in a distant town, laboring under a dangerous illness; or suppose him to be a physician, whose professional aid is required in some case of extremity ; or suppose a man’s whole fortune, and the future comfort of his family, to depend upon his being at a remote place early on Monday morning, he not having known of the necessity until Saturday evening ; these are all cases which would generally be considered as justifying the act of travel-ling. Now, to stop a man in either of these predicaments until Monday morning, or even until he should have had a trial on Sunday, would be" to defeat the very object of his journey; and thus to inflict upon him, though innocent, a punishment vastly more severe than he would have been subject to, if he had had no such excuse or justi fication.
If the law were to receive the construction which some well disposed people are inclined to give it, inconveniences would follow which were never thought of in the most rigorous times which this country has seen. It has always, we understand, been the practice among ministers of neighbouring parishes, when they found it convenient to exchange labors on the Lord’s day, if within a short distance of each other, to leave their homes in the morning, and return in the evening, of that day. Now this, considered as strictly as some tythingmen would consider it, would be an act neither of necessity nor of charity ; because the several pulpits might be as well supplied without such exchange, or the ministers might leave their homes on Saturday, and return to them on Monday. But it would be exceedingly burdensome, and tend to interrupt that intercourse which is so beneficial to ministers and their people, if it were made necessary to spend two nights from home, for the purpose of making such exchanges at five or ten miles’ distance.
It has also been the custom of the country to celebrate marriages on the evening of the Lord’s day, and for funeral services to be performed on the afternoon of that day. *We know not, that, if a clergyman should be found travelling, with a view to the performance of either of these religious offices, he might not be interrupted by some who should question the nec.es - sity of performing these acts at such a time. Indeed, such has been the overstrained zeal for the observation of the Lord’s day, that ministers have been stopped, when travelling, after service, for one or *284 other of the foregoing purposes. Surely it ought not to be in the power of tythingmen, or of justices of the peace, to detain persons travelling on such objects. It is enough, that they may be after wards complained of, and obliged to give an account of themselves and their conduct, if a magistrate or grand jury should think it expedient. to entertain such a complaint.
As a reply to this, we are again told, that tythingmen are conscientious and reasonable, and that, in all such cases, they would permit the traveller to pass. But the statute has not committed men’s rights to the keeping of other people ; and it is found better, in this as in other cases, that some guilty persons should escape, than that innocent persons should suffer. Indeed, there is no necessity "that the guilty should escape. They may be prosecuted wherever they may be found, if inhabitants of the Commonwealth ; and if strangers, it is no great evil that they should escape ; especially as they may be brought to trial, if ever they should return into the Commonwealth.
But, it has been urged, shall travelling on the Lord’s day be unlawful, and shall not the community prevent the violation of the law ? and shall the offender go on repeating the unlawful act, in spite of the law and the magistrates ? If the legislature so wills, it must be so ; for, however sacred the day, its observance cannot be enforced, except in the manner provided by law.
It was undoubtedly a difficult subject of legislation ; and a choice of difficulties presented. To prevent a violation by previous restraint could not have been done without hazarding some important personal rights and * privileges, and in most cases prejudging the guilt of the party. This was attempted by the Warden Act in the year 1782. But this was during our revolutionary struggle, when, probably, great irregularities took place; and when constitutional rights were not so well or so generally understood by the people as they have since been. This law continued but a few years in force, being found to be utterly irreconcilable to the habits and character of the people. The legislature has since been content with endeavouring to prevent travelling by subsequent punishment, instead of previous restraint. Nor is this anomalous^ as has been supposed ; for it is the only mode found practicable, to prevent the commission of other crimes. Thus, to publish libels is criminal and punishable ; but no previous restraint is laid upon writing or printing, in order to prevent the publishing of libellous or seditious matter.
For the foregoing reasons, we are satisfied,, that the statute of 1791, c. 58, does not authorize a justice of the peace to receive a complaint, and issue bis warrant, on the Lord’s day, for a violation of that law merely by travelling ; and that an arrest made on that *285 flay, pursuant to a warrant so issued, is illegal, and the officer making it a trespasser.
We believe this decision necessarily to result from a fair construction of the statute, and that it is perfectly conformable to the practical opinion entertained by the community ever since the act passed. For no instance, we are persuaded, exists, of an attempt to carry on a prosecution under the statute on the Lord’s day, until within these two or three years past. During that period, a laudable zeal has appeared for a more strict observation of the day ; but this zeal has, in this case, as it has done in many others, led some persons beyond the limits of lawful authority. If tythingmen will follow the words of the statute in the performance of their duty, there will be no difficulty in bringing offenders to justice ; and, if the present * penalties are not sufficient to prevent unnecessary travel-ling, it is the duty of the legislature to increase them, or to provide some punishment which will operate more in terrorem than a mere pecuniary mulct.
The last point ruled by the judge at the trial, to which exception was then taken, was,f that this action was well brought in the county of Hampden; although the trespass complained of was committed in the county of Hampshire, and the defendant sets up a justification as a constable of a town within the latter county.
It is objected, that this action was made local by the statute of 21 Jac. 1, c. 12, which statute, it is alleged, has force in this Commonwealth, having been adopted and used in our judicial courts before the adoption of our present Constitution. The only evidence of its having been practised upon is the dictum of Chief Justice Dana, in the case of The Commonwealth vs. Leach & al. No lawyer now in practice can recollect any instance when that statute was enforced in our courts. We would not call in question the accuracy of recollection of that able and learned judge. We presume, that, before the Revolution, when he was in practice at the bar, the statute was admitted to be in force. But, for reasons which we proceed to give, we think it has been virtually repealed by several legislative acts passed since the establishment of the Commonwealth.
By the statute of 1784, c. 28, § 13, it is provided, that all transitory actions be brought in the county where one of the parties lives, upon the penalty of double costs for the defendant, if he shall be otherwise sued. Is this a transitory action ? It certainly is, unless made local by some existing statute, according to the suggestion of the defendant’s counsel. But we believe that the legislature, in the use of the phrase transitory action, had reference to the general common law division of actions into transitory'and local, and not to such actions as, by any particular statute of England, were confined to particular counties. This general statute provision for the bring *286 ing of actions * would of course repeal any preexisting English statute which might have received force here by usage and adoption.
But the legislature of this Commonwealth seem to have considered the claims of public officers against whom actions may be brought for any thing done by them in the execution of their offices, and to have provided all the security for them which was deemed necessary. For, by the statute of 1792, c. 41, the privilege of giving their special justification in evidence under the general issue is secured to them. Now, as this was one of the provisions of the statute of James, it would seem that there was no necessity of passing this law, if that were in force ; apd the reenactment of this provision only may be considered a repeal, by implication, of any preexisting law resting only on infrequent and very limited practice for its authority.
We think, therefore, that the present action is not local; although possibly the legislature may think that due attention to the interests of public officers will require that actions of this nature should be made local.
The case of French vs. Judson goes far to show that the statute of James was not considered by the Court or counsel as in force within the Commonwealth. The plea in that case brought the defendant completely within the statute ; yet it was not cited, although a ' multitude, of authorities appear to have been looked into. It is true, the Court appear to have spoken doubtfully of the validity of such a plea, had the suit been by a party to the original action in which the execution issued. But the statute of James makes no such distinction ; and the Court expressly waived any opinion upon that subject. Actions are continually brought against sheriffs in a county different from that in which they live, or in which the facts complained of took place ; and yet we hear nothing of such actions being local. We think there is no ground for this objection to the action.

Judgment on the verdict.

 Numbers xv. 33.

 Vide Appendix to Hutch. Hist, of Mass.