## EXERCISE OF JUDICIAL POWER BY AN INTERESTED JUDGE.

Common Pleas Court of Hamilton County.

EDWARD TUMEY *v.* STATE OF OHIO.

Decided, October, 1925.

*Liquor Courts—Mayors of Villages Disqualified from Hearing such Cases—By Reason of their Financial Interest in the Outcome— Organization of Liquor Courts under Section 6212-37.*

1. The mayor of a village sitting as a court is exercising judicial power and disinterest in the event of his decision in a condition precedent to his right to exercise this power, except where his sitting is necessary to prevent a failure of justice.

2. The right to challenge the mayor of a village on the ground that he has substantial interest in the event of his decision, in the absence of statute is a right implied from the constitutional guarantee of inalienable rights and grant a remedy (trial) by due process of law.

3. The procedure whereby to challenge him in the absence of statutory procedure is to address the challenge to the mayor himself with the proof in support of the same, and if denied his action may be reviewed by the proper court.

4. The interest that will disqualify the mayor of a village under the general law, is any substantial interest in the event of his decision.

5. When the council of a village, by proceedings under authority of Section 6212-37, organizes a force of prohibition officers under its mayor and puts him to work in enforcing prohibition coextensive with the county, it thereby gives him such an interest in convictions in liquor cases by reason of the way he is situated, circumstanced and involved in this organization, as to disqualify him from sitting in the trial of such cases.

*Harry H. Shafer,* for plaintiff in error.
*Allen C. Roudebush,* for defendant in error.

STREUBLE, J.

This case is before the court on petition in error to reverse the judgment of Mayor Pugh of the village of North College Hill, finding the plaintiff in error guilty of the "unlawful possession of intoxicating liquors."

The plaintiff in error set forth several grounds of reversal,

one of which the court will consider with some particularity, because in passing upon this ground of reversal, in its application to plaintiff's case, the court must of necesttity consider and incidentally pass upon a subject-matter of serious concern to the citizenry of this state.

This subject-matter concerns the legality of the socalled commercialized enforcement of prohibition, accomplished by organizing mayors of villages, known as liquor courts, under authority of Section 6212-37, G. C. O.., and using them as special instruments in enforcing prohibition co-extensive with the county. The pertinent part of Section 6212-27 is as follows:

"6212-37. The council of any city or village may, by ordinance, authorize the use of any part of the funds collected for the violation of any law prohibiting the manufacture or sale of intoxicating liquors, for the purpose of hiring attorneys, detectives or secret service officers to secure the enforcement of such prohibition law."

Mayor Pugh, at the time of his conviction of plaintiff, was operating a "liquor court" for the village of North College Hill, and when he called plaintiff before him for trial, the plaintiff, by motion and otherwise, challenged Mayor Pugh's right to sit in judgment in his case on the ground that the Mayor as head of this "liquor court" was so situated and circumstanced as to render him "interested" in convictions in liquor cases; and the plaintiff says further that his case, being a liquor case, and Mayor Pugh being an "interested" judge, to be forced into a trial before him involving his liberty, was a violation of his constitutional right of having "remedy" (trial) by due process of law guaranteed him by both the Federal and State Constitutions.

Plaintiff, in support of his motion, offered in evidence a certified copy of Ordinance No. 125, duly passed by council of North College Hill on May 11th, 1923, creating and establishing the liquor court. This ordinance is so illuminating as to how these courts are created and the energizing task set to every one engaged in the work of the court, that it will be quoted in full.

ORDINANCE No. 125.

"An ordinance to provide for compensation to be paid from the secret service funds of the village of North College Hill, Hamilton county, Ohio, created by authority of Section 6212-37 of the General Code of Ohio, to detectives, secret service officers, deputy marshals' and attorneys' fees, costs, etc., for *services in securing evidence necessary to conviction* and prosecuting violation of the Law of the State of Ohio prohibiting the Liquor Traffic:

*Be It Ordained,* by the Council of the village of North College Hill, Hamilton county, Ohio:

Section I. That fifty percent of all moneys hereafter paid into the Treasury of said village of North College Hill, Ohio, that is one-half of the share of all fines collected and paid into and belonging to said village of North College Hill, Ohio, received from fines collected under the law of the state of Ohio, prohibiting the liquor traffic, shall constitute a separate fund to be called the Secret Service Fund to be paid for the purpose of *securing the enforcement* of any Prohibition Law.

Section II. That Deputy Marshals of the village of North College Hill, Ohio, shall receive as compensation for their services in *securing the evidence* necessary to secure the conviction of persons violating the Law of the state of Ohio, prohibiting the Liquor Traffic, an amount of money equal to 15% of the fine collected, and other fees allowed by law.

Section III. That the attorney at law of record prosecuting persons charged with violating the Law of the State of Ohio, prohibiting the Liquor Traffic, shall receive as compensation for legal services an amount equal to 10% of the fine collected, in all cases, whether the plea be guilty or not guilty.

Section IV. That detectives and secret service officers shall receive as compensation for *their services in securing* the evidence necessary to secure the conviction of persons violating the Law of the State of Ohio, prohibiting the Liquor Traffic, an amount of money equal to 15% of the fine collected.

Section V. That the Mayor of the Village of North College Hill, Ohio, shall receive or retain the amount of his costs in each case, in addition to his regular salary, as compensation for hearing such cases.

Section VI. This Ordinance is hereby declared to be an *emergency* ordinance, necessary to the immediate preservation of the public peace and safety, made necessary by reason of the flagrant violation of the Laws of Ohio, enacted to prohibit traffic in intoxicating liquors, and shall be in effect from and after this passage."

THE LIQUOR COURTS, THEIR OFFICERS AND EARNINGS.

Council, in addition to Ordinance No. 125, by other ordinances, authorized the appointment of deputy marshals, secret service officers, attorneys, etc.; and 10% of the village's portion of the fines was to be paid to the secret service fund to pay chemists, stenographers, transportation and other incidental expenses essential to the organization and operation of this "liquor court."

There was proof also of the earnings of this "liquor court" to the 31st day of December, 1923, the total amount collected from the fines was $20,000, from which the State received $8,992.50; North College Hill received $4,471.25; of which sum $2,697.25 was placed to the credit of the village safety fund, and the balance in the secret service fund. Earl Boehm, acting as prosecutor in the liquor court, received $1,796.50; the deputy marshals, inspectors and other employees received $2,697.75, and $438.50 was paid for costs in transporting prisoners, serving writs and other services in connection with the trial of these cases, and Mayor Pugh received $696.35 in fees.

The proof showed that since December 31st, 1923, this "liquor court" had earned large sums of money in fines in liquor cases which had been distributed in the same proportion as prior to December 31st, 1923.

It was admitted that Mayor Pugh was at the time, a taxpayer in the village of North College Hill, and at the time of the resignation of Mayor Vogelpohl, his predecessor, on account of his disinclination to operate a liquor court, in the public agitation that followed Vogelpohl's resignation as to whether or not the court should be continued as an enterprise of the village, Mayor Pugh in public speeches advocated the continuance of this liquor court because of the "financial" benefit to the village. Mayor Pugh was appointed as the successor of Mayor Vogelpohl.

One of the witnesses offered was Harry Zimmerman, a deputy marshal, and as his testimony is rather illuminating as to how these liquor courts are operated, a portion of it will be quoted, as follows;

Q. What is your name?

A. Harry Zimmerman.

Q. What is your business with the village of North College Hill?

A. Deputy marshal.

\*     \*     \*     \*     \*

Q. How long have you been a liquor agent?

A. Oh, about eight weeks, I guess.

Q. What did you do before you were a liquor agent?

A. I worked in the city,—New York City.

Q. How long have you been in Cincinnati?

A. \*  \*  \* About ten weeks.

Q. How did you come to get on the prohibition squad?

A. Mr. Pugh, the mayor here, I was talking to him one day, and at the time I was working in Montgomery, out of the court there, and I was talking to the mayor here one day and he asked me if I would care to come here and work for him, and I told him I would.

Q. You worked in the Montgomery liquor court for about how long?

A. About a week.

Q. How did you come to get a job out there?

A. Through the Anti-Saloon League in Cincinnati.

Q. Are you a prohibition worker; that is, you are part of the prohibition forces, are you?

A. Of North College Hill, I am, yes, sir.

Q. But not otherwise?

A. How do you mean, not otherwise?

Q. I mean you do not work in the Anti-Saloon League, is that what you say?

A. I don't make it a business, but I help them if I can; if I get the opportunity.

Q. You make it a business of being a prohibition officer?

A. Yes, sir.

Q. What salary do you get as a prohibition officer?

A. Fifteen per cent.

Q. Fifteen per cent. of what?

A. Of the fines from this village."

Mayor Pugh overruled plaintiff's motion and challenge of his right to sit in judgment in his case, and proceeding with the trial, found plaintiff guilty, imposed a fine, and the plaintiff is here on petition in error, protesting that he was forced to trial before an "interested" judge.

The plaintiff in error is invoking, as his protection from a trial by Mayor Pugh, the fundamental principle of judicial authority so well expressed in the maxim:

"No judge shall decide a case in which he has a direct, immediate, substantial interest."

In a general consideration as to whether or not this fundamental principle of law is applicable to plaintiff's situation in this case, the several claims of counsel for the state will be fully treated without special consideration.

### MAYORS OF VILLAGES—HOW CHALLENGED.

Mayors of villages functioning as judges have been left free of statutory grounds of disqualification,—they can not by authority of any statute be "sworn off the bench," and the question is by what right, if any, can they be challenged.

Nor are there any express provisions of the Ohio Constitution for disqualifying any of the judges of the State. There are, however, statutory grounds of disqualifying judges of the state, except mayors of villages, and possibly justices of the peace.

Mayors' courts in the villages have been held to be inferior courts of record. (96 O. S., 205).

It will be seen from the foregoing that mayors of villages are in a unique situation in the judicial system of this state.

The precise question was before the Supreme Court of this state (70 O. S., 124), but was passed with the remark,

"*The affidavit of prejudice.* This proposition of error is based on Section 550 Revised Statutes. This section applies to the judges of the Court of Common Pleas. It has no application whatever to Mayors; nor is there so far as we are aware, any provision of like character which affects mayors. The affidavit of prejudice was properly ignored."

This pronouncement is all right as far as it goes, that the

Section of R. S. under consideration applied to the judges of the Common Pleas Court and not to mayors; but the serious question left undecided is, can mayors of villages merely because they have been left free of statutory grounds of disqualification, "properly ignore" justifiable challenges of their right to sit as judges?

If it be held that mayors of villages functioning as judges are in this impregnable position in the judicial system of this State, then the other judges of the State can be placed in the same impregnable position by the General Assembly merely repealing the statutory grounds of disqualifying them. To so hold would be to place the power in the Legislature by action, or mere inaction, to subject the citizenry of this State to trials involving their inalienable rights, by judges "interested" in the event of their decisions.

The conclusion is inevitable that the right to disqualify judges in the absence of statute, from sitting in trials in which they have a substantial interest in the event of their decisions, is a right implied from the following guarantees of the Ohio Bill of Rights, Article I, Section 1:

"All men are by nature free and independent, and have certain inalienable rights among which are those of enjoying and defending life and liberty, acquiring, posesssing and protecting property, and seeking and obtaining happiness and safety."

And Article I, Section 16:

"All courts shall be open and every person for an injury done him in his land, goods, person or reputation, shall have remedy by due process of law, and shall have justice administered without denial or delay."

Mayor Pugh was functioning in plaintiff's trial as a judge of an inferior court of record and exercising judicial power.

Plaintiff's inalienable rights were involved in his trial and disinterest of Mayor Pugh in the event of his decision in plaintiff's case, was essential to plaintiff's right of trial by "due process of law."

By Article 4, Section 1 of the Ohio Constitution, the judicial power of the State is vested in the courts named in the Con-

stitution and courts inferior to Courts of Appeal that may from time to time be created by the Legislature.

There was left to the Legislature only the apportionment and distribution of the judicial power of the State to the courts, except as to the distribution made in the Constitution itself.

The framers of the Constitution understood what was meant by the judicial power of the State in the general law of the land at the time of the adoption of the Constitution, and the conditions attending its exercise, one of which was that only judges disinterested in the event of their decisions had any right to exercise judicial power.

By vesting the judicial power of the State in the courts without qualification, the people thereby preserved this principle of judicial authority as it was then understood in the general law of the land as much as if they had done so by express provisions of the Constitution.

It is not within the province of the Legislature by its enactments or failure of enactments, nor of the courts by their decisions, to give the words "judicial power" any other meaning, nor to alter the conditions of its exercise. The vesting of the judicial power of the State in the courts was an act of the people and changes, if any, must be made by the people and not by the Legislature nor by the courts.

Indeed there are authorative decisions expressing a doubt as to the power of the people of a state in the framing of their constitutions, to abolish this fundamental principle of judicial authority, since the adoption of the 14th Article of the Amendments to the Federal Constitution which denies to the states the right to deprive a person of life, liberty and property without due process of law. *Matter of Leefe,* 2 Barb. Ch., 39.

However this may be, under a constitution such as we have in Ohio where the judicial power is vested in the courts without qualification, there can be no question that the Legislature is without the power to set aside this maxim of the common law, and by action or mere inaction, permit one to act judicially when interested in the controversy.

Cooley, in his Constitutional Limitations, 7th Edition, pages 592 and 594 in discussing the subject says that outside of certain cases where a judge must act from necessity, and where the interest is "trifling and insignificant,"

"We do not see how the legislature can have any power to abolish a maxim which is among the fundamentals of judicial authority. The people of the State, when framing their constitution, may possibly establish so great an anomaly, if they see fit; but if the legislature is entrusted with apportioning and providing for the exercise of the judicial power, we cannot understand it to be authorized, in the execution of this trust, to do what has never been recognized as being within the province of the judicial authority."

Quoting further from this eminent author:

"Nor do we see how the objection of interest can be waived by the other party. If not taken before the decision is rendered, it will avail in an appellate court; and the suit may there be dismissed on that ground. The judge acting in such a case is not simply proceeding irregularly, but he is acting without jurisdiction. And if one of the judges constituting a court is disqualified on this ground, the judgment will be void, even though the proper number may have concurred in the result, not reckoning the interested party.

"Mere formal acts necessary to enable the case to be brought before a proper tribunal for adjudication, an interested judge may do; but that is the extent of his power."

In the absence of statutory procedure whereby to challenge an interested mayor acting as a judge, it is proper to make the challenge direct to the mayor himself, as was done by the plaintiff in this case, and if denied by him, incorporate the proof indicating his interest in a bill of exceptions and bring the matter before a proper court for review by a petition in error, as was done by the plaintiff in this case.

CHARACTER OF INTEREST DISQUALIFYING A JUDGE.

It has been held in this State (37 O. S., 159) that it is a pecuniary interest only that will disqualify a judge, and further that the dependency of his court costs on the event of his decision is not such a "pecuniary interest" as will disqualify a judge.

Mayor Pugh has only his court costs depending on' his de-
cision in these liquor cases,—he does' not participate in the
"split" of the fines so far ·as the proof in the pending case
shows.

Counsel for the State claims that admitting that there is
the right to challenge Mayor Pugh under the implied powers
in the Constitution, nevertheless, Mayor Pugh is not subject to
challenge because the only pecuniary interest he has in the
plaintiff's case is his court costs.

The facts which plaintiff claims constitute 'Mayor Pugh's
disqualifying interest in his case, will be considered under an
appropriate heading.   It is sufficient here to say that plain-
tiff's point is that it is the way Mayor Pugh is involved in
this organization in the village of North College Hill that
constitutes his ·disqualifying interest in his decisions in liquor
cases.   One of the circumstances is the large sums of money
he is making from court costs in liquor cases as distin-
guished from the very minor monetary interest by way of
costs of judges functioning in the ordinary way where neces-
sity of preventing a failure of justice has something to do
with the courts holding that court costs are not such a pecun-
iary interest as will disqualify a judge.

In the case cited 'by counsel in support of his contention
(37 O. S., 159), the court was construing interest as a statu-
tory ground of removal of a case from the district wherein a
judge was interested in the event of his decision in a case
then pending before him, and held; that the word "interest"
in the sense in which it was used in the statute, meant a
"pecuniary interest."

In the pending case, however,. we are not considering in-
terest as a statutory ground of disqualification, but interest
in the sense in which it is understood in the general law of
the land as an incident to the exercise of judicial authority
and so concretely stated in the maxim:

"No judge shall ·decide a case in which he has a direct,
immediate, substantial interest."

The interest here is more than a merely pecuniary interest.

It is any present interest that is humanly likely to, or ordinarily does, unbalance the scales of justice and leave a party before a judge interested in the event of his decision.

The meaning of "interest" as a statutory ground of disqualification depends upon the sense in which it is used in each particular statute, but here we are considering the sense and meaning the framers of our Constitution understood it to have in the common and general law of the land as a princlple of natural justice and as a condition to the exercise of judicial power.

Quoting a few exerpts from the opinions of some of the great judges of the country will indicate that there are other "interests" than mere pecuniary interests, that will disqualify judges.

In *Cotulla State Bank* v. *Herron*, 202 S. W., 797, (p. 988 Corpus Juris) the court says:

"An independent, unbiased, disinterested, fearless judiciary is one of the bulwarks of American liberty, and nothing should be suffered to exist that would cast a doubt or shadow of suspicion on its firmness and integrity."

In *Yazoo etc. R. Co.* v. *Kirk*, 102 Miss., 41, (p. 988 C. J.) the court says:

"Every litigant is entitled to nothing less than the cold neutrality of an impartial judge, who must possess the disinterestedness of a total stranger to the interests of the parties involved in the litigation, whether that interest is revealed by an inspection of the record, or developed by evidence *aliundi* the record."

Plaintiff's claim is that Mayor Pugh is so involved in this organization in the village of North College Hill, which he calls a "liquor court," as to give him an interest in convictions in liquor cases.

Plaintiff's claim involves an effort on his part to apply the fundamental principle of judicial authority heretofore discussed, to a new set of facts, for it must be remembered that the organization of mayors of villages to specialize in the enforcement of prohibition is entirely new to the jurispru-

dence of this country, and wholly the creations of prohibition enforcement under the laws passed in this state for that purpose.

These organizations in villages functioning specially in the enforcement of prohibition co-extensive with the county, have been given the name ''liquor courts'' by a discerning public, a name particularly appropriate because they are mayors of villages organized by councils of the villages under authority of. Section 6212-37, *supra,* and made to function specially in the enforcement of prohibition co-extensive with the county as distinguished from mayors of villages not organized under authority of said section, but left alone to function in the ordinary way within their own villages.

They are known too as ''commercialized courts'' because they are in fact village enterprises duly organized and making a business of enforcing prohibition for the money to be made for the village and all concerned in the work of these courts, out of fines and costs collected by the mayor in liquor cases. The Legislative authority for having these organizations is Section 6212-37, *supra.* The right to have them was limited to the cities and villages of the state, but it is quite clear that they were to be made use of in villages only, as none have been organized in the cities. Not all of the villages have them; only those that were ''induced'' to organize them have them.

The favor was not extended to the State itself, nor the counties, nor the townships, but only to the villages and cities, and only for the purpose of enforcing prohibition. Without this section of the General Code, there could be no liquor courts in the state, nor could there be in any city or village without action of its council under authority of this section.

The concurrence of numerous persons is essential to the organization and successful operation of a liquor court. The mayor of a village cannot himself have and operate a liquor court,—he has jurisdiction of liquor cases, but left to himself he must stay within his village,—left alone he can do only a local or retail business within his own village. If he is to

engage in the enforcement of prohibition beyond the limits of his own village, his council, by ordinance and resolutions, must organize and equip him,—give him the men and the means of sending out of the village· and having the cases hunted up and brought before him for trial.

It requires as much legislation and pre-discussion of the citizenry of a village to establish a liquor court as it does to build a water works or an electric light plant.

The mayor must be willing to operate it, because if he .refuses to act it cannot be made to go; the council must be willing to organize and equip it and to share liberally with the deputy marshals, detectives, secret service officers, "bird dogs" that do the hunting for the cases; otherwise than by this mutuality of understanding and concurrence of action, it cannot be made to function successfully. ˙

Is it not apparent that the mayor of a village who becomes a party to the mutual understandings of all the nuemerous persons essential to the organization and successful operation of a liquor court, has expressly or impliedly agreed to a policy of its operation and in a way pre-judged every case that is to come before him?

There are other circumstances affecting the independence and disinterestedness of the mayors operating liquor courts which are now matters of common knowledge.

It is now quite well understood that Mayors' courts in villages organized under Section 6212-37, *supra,* were intended to be, and were in the beginning· of prohibition enforcement, a part of the machinery of the state for the enforcement of prohibition.   In· the beginning the Prohibition Commissioner of Ohio, through his inspectors (card men) and unofficial help, went propogandizing and organizing these liquor courts in villages throughout the state.    Through the efforts of his department a cordon of these village liquor courts was thrown around every large city in Ohio and made to function in the enforcement of prohibition in these cities, wherein it was felt that the officers therein might be disinclined to enforce prohibition with the rigor thought to be essential to its initial success.

State inspectors (card men) were sent to these liquor courts to run the business, and through these inspectors the Prohibition Department of the State dominated the whole system until the unexpected happened, in the opinion of Attorney General Crabbe holding that state inspectors (card men) could not at the same time be deputy marshals of these villages.

This opinion of the Attorney General severed the official connection between the State Prohibition Department and these liquor courts, and the state inspectors, in most cases, resigned their positions with the state and held their positions as deputy marshals of these villages, and the villages ever since have been running the business on their own hook, and conducting a form of banditry under the cover of enforcing prohibition.

That an ulterior influence has been operating on the minds of the mayors of these village courts from the beginning is clearly indicated by the difference in the character of the fines imposed before Attorney General Crabbe's opinion and since. Before his opinion the fines generally were very heavy and close to the maximum, made so by the judges of these courts, to meet the views of the Prohibition Department of the state, that in these liquor cases the imposition of heavy fines was the best means of checking the infractions of the liquor law.

Since Attorney General Crabbe's opinion and the Prohibition Department of the state lost its control of these courts, there has been a very noticeable change in the character of the fines imposed by the mayors of these courts; in most cases the fines are whatever the traffic will bear without the necessity of jailing the offenders, and are almost entirely a matter of bargaining with the offenders as to what shall be paid without any pretense on the part of the judges of judicially determining the amount of fines properly to be imposed.

### JURISDICTION AND POWER OF LIQUOR COURTS.

The power and authority given of making of mayors of villages special instruments in the enforcement of prohibition was bad enough, but considering this in connection with what has been done in other ways for prohibition enforcement, we

are forced to conclude that we have a situation that seriously menaces the liberties of the people.

The most amazing thing done was to give the courts, mayors' courts included, final jurisdiction without juries of an entirely new class of crimes penalized with such heavy fines, thus bringing into the judicial system of this state, through the instrumentality of these liquor courts, a large measure of judicial tyranny and arbitrary power.

Since Magna Charta the English people have relied on the privilege of the writ of habeas corpus and the right of trial by jury as a means of protecting themselves against judicial tyranny, and the exercise of arbitrary power.

I wish that space would permit quoting all that that eminent jurist, Judge Ranney, has to say in his opinion in *Work* v. *State of Ohio*, 2 O. S., 302, about these bulwarks of liberty and the great solicitude of the people, that they be preserved in the fundamental law of the land as they were in the common law.

He has this to say as to the right of jury trials:

"The institution of the jury referred to in our constitution, and its benefits secured to every person accused of crime, is precisely the same in every substantial respect as that recognized in the great charter and its benefits secured to the free men of England, and again and again acknowledged in fundamental compacts as the great safeguard of life, liberty and property; the same, brought to this continent by our forefathers, and perseveringly claimed as their birthright, in every contest with arbitrary power, and finally, an invasion of its privileges prominently assigned as one of the causes which was to justify them, in the eyes of mankind, in waging the contest which resulted in independence. Nor did their affection for it then diminish or cool.

"They made it a corner-stone in erecting the state governments; and after the adoption of the federal constitution, without a provision securing it, they did not rest satisfied until they had proposed and carried an amendment, giving to every person accused of crime in the courts of the Union, 'the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed.'

"In the ordinance of July 13, 1787, which first extended

civil government over the territory northwest of the river Ohio, it was made an unalterable article of compact, that 'the inhabitants of the said territory shall always be entitled to the benefit of the writ of habeas corpus, and of the trial by jury.' Upon the organization of the state government in 1802, provisions, substantially the same as those in the present constitution, were inserted in the bill of rights. It thus appears that persons accused of crime have, for every moment of time since civil government existed within the territory of this state, by fundamental laws, been secured in the right of trial by jury. An institution that has so long stood the trying tests of time and experience, that has so long been guarded with scrupulous care, and commanded the admiration of so many of the wise and good, justly demands our jealous scrutiny when innovations are attempted to be made upon it.''

Prohibition offenses under the Ohio laws were taken bodily from the Volstead law with this difference; under the Volstead law imprisonment is a part of the penalty and hence the accused are given jury trials in the Federal courts; while in Ohio the same offenses are penalized with a fine only, thus denying the accused jury trials. We have here an intersting contrast in the classification of identically the same crimes.

The purpose in Ohio was to evade jury trials and to give the courts greater freedom of action, especially mayors of villages who were to be made to fit into the machinery of the State for the enforcement of prohibition. In *Cochran* v. *State*, 105 O. S., 541, our Supreme Court sustained the constitutionality of what was done for the enforcement of prohibition. In the *Cochran case* the court quoted with approval the language of Judge Wanamaker in 102 O. S., 65, wherein he states the law to be as follows:

''Where the penalty imposed by criminal statute is merely a fine, the right of trial by jury as guaranteed by the constitution does not apply.''

The guarantees as to jury trials are contained in the 5th and 10th sections of Article 1, Bill of Rights of the Ohio Constitution. The 5th section is as follows:

''The right of trial by jury shall be inviolate.''

Section 10 in part is as follows:

"Except in ·cases of impeachment  *  *  *  and cases in-
volving offenses for which the penalty provided is less than
imprisonment in the penitentiary, no person shall be held
to answer for a capital or otherwise infamous crime, unless
on presentment or indictment of a grand jury."

and so on describing the form of trial which includes an
"impartial jury of the county in which the offense is alleged
to have been committed."

The common law classification of criminal offenses as felon-
ies and misdemeanors has been followed in Ohio.

By statute in Ohio, "offenses which may be punished by
death or imprisonment in the penitentiary are felonies; all other
offenses are misdemeanors."

Thinking in the language of Section 10, *supra*, "offenses for
which the penalty provided is less than imprisonment in the
penitentiary, are misdemeanors," and, "offenses for which the
penalties are death or imprisonment in the penitentiary are
felonies."

It will be noted that the form of trial for a felony is fixed in
Section 10, *supra*, but as to the form of trial for one accused
of misdemeanors, the Constitution is silent; hence the form
of trial for misdemeanors is left entirely to the Legislature,
except that it has been held that the constitutional guarantee
that "the right of trial by jury shall be held to be inviolate,"
requires the inclusion of a jury in the form of trial for mis-
demeanors where imprisonment is a part or whole of the
penalty.

So, the General Assembly penalized prohibition offenses with
a fine only, thus evading jury trials and giving the courts
summary power of disposing of liquor cases, and yet by the
indirect means of heavy fines, the offenders can be punished
more severely than if they were convicted of any of the
other misdemeanors, or any of the felonies except a few of
the most heinous.

Let us get before us the "fines only" that can be imposed for
violation of the prohibition laws. Section 6212-15 G. C. of O.
makes it a crime to "manufacture, sell, barter, transport, im-

port, export, deliver, furnish, receive, give away, prescribe, possess, solicit or advertise any intoxicating liquors, etc.''

Section 6212-37, provides in part as follows:

''Any person who violates the provisions of this act, for a first offense shall be fined not less than $100.00, nor more than $1000.00; for a second offense, not less than $200.00 nor more than $2000.00.''

One who goes on a perambulating spree on New Year's eve, is likely to commit so many prohibition offenses that he could be sent to jail for a generation in default of paying the fines a liquor court has the power under these sections to inflict him with. Some of the violations could, by a slight manipulation, be framed as second offenses.

It takes over nine years to work out a fine of $2000.00 in jail at sixty cents a day, which can be imposed for a second offense.

The average time, I am informed, that those convicted of second degree murder stay in the penitentiary is, approximately eight and a half years.

If there is a default in the payment of a fine or securing its payment, there is nothing to be done in these liquor cases but to work it out in jail, as the courts have no right to remit the fines or suspend the sentence. Nor is there anything that can be allowed for good behavior; nor can there be a pardon except from the Governor. Wholly as a result of this form of prohibition enforcement, there is a situation in the jails of this state that calls for executive clemency,—and that is of the men in jail working out heavy fines at sixty cents a day that will take years,—fines imposed by interested and dominated mayors of these liquor courts, before Attorney General Crabbe rendered his opinion terminating their official connection with the prohibition department of the state.

### PETTY CRIMINAL OFFENSES.

There was a class of criminal offenses under the English law at the time and prior to the adoption of the Federal constitution, that were tried summarily by the courts without the intervention of a jury. In the trial of all other criminal

offenses the accused was entitled to a jury trail; and it was the purpose of the framers of the Ohio, as well as the federal constitution, to preserve for the people in these instruments the right of jury trial as it was under the common law.

Judge McIlvaine, in his opinion in *Inwood* v. *The State,* 42 O. S., 187, says:

"The provisions of the Constitution relied on as nullifying the statute, are Sections 2 and 10, Article 1. The former provides, 'the right of trial by jury shall be inviolate.' It is settled beyond further discussion that this clause in the Constitution was not intended to enlarge or modify the right of trial by jury. Its sole purpose was to guarantee the perpetuity of the institution as it then existed and as it had long existed at common law." (*Work* v. *State*, 2 O. S., 296.)

Now what were the criminal offenses tried by the court only under the common law?

Justice Brewer in his opinion in *Schick* v. *U. S.,* 195 U. S., 65, speaks of this class of cases as "petty criminal offenses." Justice Brewer in this case had occasion to construe the provision of the federal constitution providing that "the trial of all crimes except in the cases of impeachment shall be by jury;" and he has this to say:

"It is obvious that the intent was to exclude from the constitutional requirements of a jury the trial of petty criminal offenses."

"Petty criminal offenses" could be proceeded against summarily under the English law and the framers of the federal constitution intended to give our people only what the English people had under the common law, so, these offenses were not included in the constitutional requirement of jury trial, *Callam* v. *Wilson*, 127 U. S., 540.

"Petty criminal offenses" were not "crimes" in the sense in which the word was understood under the common law and by the framers of the federal and Ohio constitutions, and it is to the common law we must look for legal definitions and judicial ideas in interpreting these instruments.

Quoting from the opinion of Justice Brewer in *Schick.* v. *U. S. supra,* on Blackstone's definition of crimes:

"In the light of this definition we can appreciate the action of the convention which framed the Constitution. In the draft of that instrument, as reported by the committee of five, the language was 'the trial of all criminal offenses  *  *  *  shall be by jury,' but by unanimous vote it was amended so as to read 'the trial of all crimes.' The significance of this change cannot be misunderstood. If the language had remained 'criminal offenses,' it might have been contended that it meant all offenses of a criminal nature, petty as well as serious, but when the change was made from 'criminal offenses' to 'crimes' and made in the light of a popular understanding of the meaning of the word 'crimes,' as stated by Blackstone, it is obvious that the intent was to exclude from the constitutional requirements of a jury the trial of petty criminal offenses."

"Petty criminal offenses" are spoken of by text writers, judges and others as "minor offenses, inferior offenses," and in *Markel* v. *Akron*, 140 O., 586, the court designates them as "*quasi* criminal offenses."

"It is true, for offenses *strictly criminal and infamous*, punishment can only be inflicted through the medium of an indictment or presentment of the grand jury. Constitution of Ohio, Art. 8, Sec. 10, there are however many offenses, made so by statute, which are but *quasi* criminal, and where the legislature may direct a mode of redress, untrammeled by this constitutional provision. Such as Sabbath breaking, selling spiritous liquors on Sunday, and the disturbance of religious meetings, with many others. Swan's Stat., 255-256. Long acquiescence in these enactments goes far to show the construction which has been placed by all on the constitution, and that there may be many offenses though decidedly immoral and mischievous in their tendencies, that are not crimes, but at most only *quasi* criminal."

Under the English law at the time of the adoption of the federal constitution, this class of criminal offenses was penalized by petty fines only.

Blackstone has this to say as to this class of cases:

"Another branch of summary proceedings is that before *Justices of the peace,* in order to inflict divers *petty pecuniary mulcts,* and corporal penalties by act of parliament for many disorderly offenses; such as common swearing, drunkenness,

vagrancy, idleness and a vast variety of others, for which I must refer the student to the justice books formerly cited, and which used to be formerly punished by the verdict of a jury- in the court-leet.'' Cooley's Blackstone, Book 4, p. 448. Star, p. 281.

The general rule of common law was that ''fines were to be limited to the circumstances and personal estate of the person to be fined.'' Cooley's Blackstone Book 4, Chap. 29, No. 379.

In the application of this rule if a person was ever sent to jail in default of payment of a fine, it would be due entirely to wilfulness on his part.

It was not only the petty nature of the offenses, but the petty nature of the penalties, viz., insignificant fines only that by the policy of the common law were imposed for such offenses that actuated the framers of the constitution in excluding petty criminal offenses from jury trials and constitutional procedure.

The very general practice in this country and in this state where offenses are punished with fines only, has been heretofore to make the fines of a mild character indicating a common understanding that such was the intention of the framers of the constitution. It would seem that the intention of the framers of the constitution by the inhibition against ''inflicting of cruel and unusual punishments'' and imposing ''excessive fines'' was to restrict the use by the Legislature of this form of penalizing crimes; otherwise it would seem that such offenses would have been included in the guarantees as to jury trials.

This constitutional inhibition is an admonition to the Legislature as well as to the courts.

The words ''excessive fines'' and ''cruel and unusual punishments'' were taken from the English Bill of Rights and put in our own constitution by the framers thereof that our people may be similarly protected. Jones' Blackstone Book 4, Section 427, p. 2622.

''Fines only'' under the English law, were to be reasonable, otherwise they were ''excessive'' and they were considered un-

reasonable, and therefore excessive if they were made larger than one's circumstances and personal estate would bear. Whether they were reasonable or not was for a time determined by a jury; this practice, however, fell into disuse. Of this Blackstone says:

"And since the disuse of such inquest it is never usual to assess a larger fine than a man is able to pay without attaching the implements of his livelihood; but to inflict corporeal punishment, or a limited imprisonment instead of such fine as might amount to imprisonment for life." Cooley's Blackstone, Book 4,* page 380.

"Excessive fines" being prohibited by the Ohio bill of rights, it is not within the province of the Legislature to use this form of penalizing offenses to accomplish severe punishment.

If this is to be accomplished, it is to be done by penalizing such offenses with imprisonment and then the accused becomes entitled to a jury trial by force of the 5th Section, Article 1, of the Bill of Rights, that:

"The right of trial by jury shall be inviolate."

The legislative way of classifying crimes is indicated by the penalty imposed, as for example, the first and second offenses for the unlawful possession or sale of intoxicating liquor are penalized with a fine only; hence these are misdemeanors, while the third offense is penalized by a fine or imprisonment in the penitentiary; hence the third offense is a felony.

According to the mere letter of the Ohio constitution, any or all of the crimes on the statute books could be penalized with a fine only, and if there is no limitation to this form of penalizing crimes, then the Legislature can dispense entirely with jury trials and constitutional procedure.

The courts, of course, are considering this form of penalizing crimes as applicable only to misdemeanors, but whether an offense is a misdemeanor or a felony depends upon the way the Legislature penalizes it. Would it have been constitutional to have doubled, or trebled, or quadrupled the

fines only for the first and second offenses under the prohibition laws, without providing jury trials? If so, and there is no limit to its right to use this form of penalizing offenses, then by means of prohibitive fines life imprisonment can be made possible without jury trials.

Necessarily the Legislature must be the arbiters of the penalties for the crimes it creates, but the exercise of this power is subject to the guarantees in Sections 5 and 10, Article 1, of the Ohio Bill of Rights.

The fundamental purpose of the framers of our Constitution was to preserve for the people under the Constitution what they had enjoyed under the general law of the land at the time of the adoption of the Constitution.

### MAYORS ORGANIZED—A MENACE TO LIBERTY.

The particular menace to the liberties of the people in the system in vogue is the way mayors of municipalities can be organized and put to work specializing in the enforcement of prohibition, co-extensive with the county.

Mayors function in a dual capacity, exercising both executive and judicial powers except in cities having a police court or municipal court functioning independently of the mayor. Except for the enforcement of prohibition and otherwise in minor ways, mayors function entirely within their own municipalities.

The mayor of a village is its chief executive officer; he is its chief conservator of the peace, and then it is well to catch the significance of this in considering the use made of mayors of villages in the enforcement of prohibition:

"The marshal shall be the peace officer of the village and the executive head, *under the mayor,* of the police force. The marshal, deputy marshals, policemen, or nightwatchmen under him, shall have the power conferred by law to police officers in all villages of the state, and such other powers not inconsistent with the nature of their office, as are conferred by ordinance." (Section 4385 General Code of Ohio.)

By this section any force organized under authority of Section 6212-37, *supra,* comes "under the mayor" and subject to his control.

In state cases it is provided that:

"The mayor shall have final jurisdiction to hear and determine any prosecution for a misdemeanor unless the accused is by the constitution, entitled to a trial by jury." (Sec. 4536, G. C.)

His jurisdiction in such cases shall be co-extensive with the county. The final jurisdiction of mayors under this section, otherwise than as to prohibition offenses, is of a very minor character.

The mayor of a village presides at the meetings of council and has a vote on legislation in the event of a tie, so he is, to a slight extent, a legislator.

As will be seen, the mayor of a village, within his own village, is chief of everything. Chief executive officer, chief conservator of the peace, chief of police and the only judge within his village.

This anomalous situation of mayors of villages was siezed on and made the basis of the system in vogue in this state for enforcing prohibition.

If there is a finality of principle in government it is that a separation of the legislative, executive and judicial departments, and freedom to function independently, is essential to the preservation of the liberties of the people. Our forefathers entertained this view and constructed the federal government on this theory and it has stood the test of time and confirmed the wisdom of their action. Federalist (Hamilton), p. 429.

Mayors in their way of functioning violate this fundamental principle of government, but so long as they were left alone to exercise a very minor jurisdiction within their own municipality, where the people had the power of political restraint, it was not a matter of serious concern, but for the enforcement of prohibition they were given final jurisdiction coextensive with the county, of an entirely new class of crimes penalized with heavy fines only, and with amazing freedom of action in the exercise of this jurisdiction, and it is a matter of serious concern when the council of a village can organize a force under its mayor and set him to functioning in his

joint capacity as executive and judge co-extensive with the county in enforcing prohibition, or any other class of crimes. Mayors of villages thus become, as it were, mayors of the county, in so far as enforcing prohibition is concerned, and the citizenry of the county are left without even the power of political restraint.

It may be said that all this is, is that mayors have been put to doing on a large scale what they have heretofore done on a small scale within their own municipalities. This in a sense is true, but there is a difference; the proponents of the laws for the enforcement of prohibition made a mole hill of jurisdiction into a mountain of jurisdiction with authority of council of giving mayors a corresponding increase of executive or police powers commercialized to create the power enthusiasm in the enforcement of prohibition co-extensive with the county. There is a vast and essential difference between the mayor of a village organized under authority of Section 6212-37, *supra*, and one unorganized and left to function in the ordinary way within his own village.

It is pertinent to note that only those mayors running liquor courts and making a business of enforcement of prohibition, co-extensive with the county, have been the subjects of public criticism.

During the pendency of this case, it has come to the court's notice that the council of the village of North College Hill repealed the legislation creating its liquor court, and Mayor Pugh was thus forced out of the business of enforcing prohibition co-extensively with the county. Prior to this the force under him was terrorizing the entire western section of Hamilton county, and almost every day Mayor Pugh's name appeared on the front pages of the daily papers.

Mayors of villages (most of the cities have police and municipal courts) by reason of their anomalous way of functioning, furnish the only opportunity in the judicial system of this state, of a system of law enforcement such as was given the prohibitionists for the enforcement of the prohibition laws.

Mayors are the only officials exercising two functions of

government. Where the three departments of government are separate and function independent of each other, the system in vogue would be impossible, and any legislative attempt to fasten such a system around any other official, would be concededly unconstitutional. (56 O. S., 628.)

If there is no constitutional weakness in what has been done for the enforcement of prohibition, then the system can be extended by legislative authority to accommodate other groups of the citizenry for the enforcement of other classes of crime.

The gambling laws; Sabbath breaking laws; sex laws; any class or kind of crime can be enforced in the same way. Village councils could then organize under the mayor, a special force for each class of crime, and have its prohibition "squad," its gambling "squad," and so on, *ad libitum,* according to the demands of ever increasing groups, having reforms which they wish enforced by criminal action.

Mayors of municipalities were not expressly created as judges, but just grew up by the Legislature from time to time conferring upon them jurisdiction of misdemeanors. (7 .O. S., 387; 65 O. S., 390.)

The Legislature in the exercise of its power to provide for the organizations of municipal corporation, created the office of mayor and made him the chief executive officer. Section 4248 General Code provides:

"The executive power and authority of villages shall be vested in a mayor, clerk, treasurer, marshal, street commissioner, and such other officers and departments thereof as are created by law."

Nowhere are mayors mentioned as judges except from time to time they have had extended to them the right to exercise judicial power.

Now mayors have been assigned a place in the judicial system of the state as courts inferior to the courts of appeal, which the Legislature may establish under authority of Article 2, Section 18 of the Constitution, and as such have a right to receive and exercise judicial power which the Legislature may from time to time give them.

In *Markle* v. *Town Council of Akron*, 14 O., 589, the claim was made that the making of ordinances and by-laws by a town corporate is legislation and that it could not be done because such power by the constitution was vested in the General Assembly. As to this claim, the court said (page 591):

"It is not, however, the exercise of legislative power. A statute enacted by the general assembly prescribes a rule of action which operates upon all—the willing and unwilling. It comes from the superior, and the inferior is bound to obey it. The charter to a municipal corporation is the exercise of legislative authority. It permits the establishment of by-laws and ordinances; but these are a matter of compact and agreement among the corporators. They do not act upon others, but only upon themselves, and by mutual consent, either directly or indirectly expressed, through the city or town council. These ordinances, so made, are not the legislative power vested exclusively in the general assembly."

By a parity of reasoning the power of a mayor to enforce municipal ordinances and by-laws, would not be the exercise of judicial power of the state which, by the constitution is vested in the courts; but his right to enforce municipal ordinances and by-laws, like the right of council to make them, is a matter of compact or agreement of the corporators.

The courts have had no trouble in assigning constitutional reasons for limiting the force and effect of municipal ordinances and by-laws to the municipality making them. The territorial limits or judicial district of a mayor enforcing municipal ordinances, is his municipality. The state, however, has been making ever increasing use of mayors as its agents in the enforcement of the criminal laws of the state. There is no question but that in enforcing the criminal laws of the state, mayors are exercising the judicial power which, by the Constitution, was vested in the courts.

It is constitutionally necessary that they be held to be courts to entitle them to receive and exercise the judicial power which the Legislature has vested them with; but they are created as executive officers and nowhere as judges in any legislation concerning them. They have been built up as judges until now when organized under Sec. 6212-37 *supra*,

they can function as executive and judge in enforcing prohibition co-extensive with all the counties in which their municipality has territory.

It is quite possible to organize, if they do not already exist, four or five villages with liquor courts at pivotal points in the state where counties containing the more populous cities come together; liquor courts that would have under their jurisdiction 50 to 75 per cent of the people of Ohio.

The village of Milford has territory in Hamilton and Clermont counties, and the village of Loveland has territory in Hamilton, Clermont and Warren counties. Hamilton county constitutes the first judicial district; Clermont county is in the first subdivision of the fifth judicial district, and Warren county is in the third subdivision of the second judicial district. Here are villages each having a population of from twelve to fifteen hundred, electing mayors functioning in the enforcement of prohibition over a population of half a million.

It would be interesting to have a tabulation of the political subdivisions—counties, townships, villages and cities, in which these mayors are functioning.

Justices of the peace, as constitutional and now as legislative courts, municipal courts and mayors have always been given final jurisdiction of misdemeanors to some extent co-extensive with their counties, and the power of the Legislature to be so has uniformly been sustained by the courts. The constitutional courts have their judicial districts, and to a large extent the subject-matter of their jurisdiction and where they are to be elected, fixed in the Constitution.

The power given the General Assembly of creating inferior courts was given to accomodate the needs of the judicial districts into which the state is apportioned for judicial purposes, and political subdivisions, the counties, townships and municipalities. A fair inference from all the provisions of the Constitution relating to inferior courts, is that the judges thereof as to the subject-matter of their jurisdictions are to function in and be elected by the electors of the judicial district or political subdivision, for which the courts were

created. How, otherwise, can it be said that the people are exercising their right of electing their judges?

As to this subject, the court in *Leland* v. *McBriar*, 15 O. S., 598, says:

"The general principle which pervades the Constitution on this subject is that no one shall be allowed to participate in the election of officers whose jurisdiction will not extend over him, or territory include the place of his residence; but that the electors of each district or civil subdivision of the state shall have the right to select their own official representatives or public functionaries."

The construction placed by the courts on the provisions of the Constitution relating to legislative courts, brings into the judicial system of this state unfortunate results.

The people are constantly being subjected to great inconvenience and wrong from the exercise of such jurisdiction by justices of the peace and particularly mayors of villages.

Some group or another of the citizenry, selfishly interested in the enforcement of some penal statute, is constantly making arrangements with a mayor or magistrate in the outlying sections of his county to take cases which will be brought to him, and the victims are forced into trials before courts with whom an arrangement has been made.

There is a difference between an inferior court expressly created by the Legislature and mayors who have been made into judges in the indirect way I have pointed out. It surely is not in harmony with the judicial system of this state for the Legislature to take an executive officer of a municipality and vest him with judicial power to be exercised here and there and most anywhere the Legislaure wills.

While I visualize in the way mayors of villages are being used in enforcing prohibition and the opportunity of extending the system in the enforcement of other classes of crime as constituting a very present menace to the constitutional liberties of the people, yet the particular purpose of mentioning the situation was for its bearing upon plaintiff's claim that he was forced to trial before an "interested" judge.

It is hard to conceive legislation better designed to hem a

judge in a net of circumstances more likely to make him "interested" in convictions than this prohibition legislation.

There is here such an open opportunity for making easy money by convictions, that it is inconceivable that the mayors running these liquor courts are not "interested" in convictions.

In *Gregory* v. *C. C. & C. Ry. Co.*, 4 O. S., 678, the Supreme Court in its opinion quotes with approval the language of Chief Justice Parker in his opinion in *Pearson* v. *Atwood,* reported in 12 Mass., 324.

This case supports the claim of plaintiff that it is the way Mayor Pugh is involved, situated and circumstanced as head of this organization in the village of North College Hill that gives him his interest in convictions in liquor cases.

Our Supreme Court has this to say about the matter:

"In the case of *George A. Pearson* v. *John Atwood,* found in 13 Mass., 324, the interest of judges is discussed by Chief Justice Parker. The plaintiff brought an action of trespass against the defendant, for arresting the plaintiff, on a warrant held by the defendant as constable.

It appeared that a justice of the peace had issued a warrant to the defendant to arrest the plaintiff for a violation of the Sabbath day; that by the laws of Massachusetts a moiety of the fines went to the town in which the justice resided, and that, therefore, he was interested. And, although the court did not find it necessary, in the case, to hold the act of the justice wholly void, yet the chief justice, in commenting on the law, says: 'It is very certain that by principles of natural justice and of the common law, no man can lawfully sit as judge in a case in which he may have a pecuniary interest. Nor does it make any difference how small the interest is. Any interest, however small, has been held sufficient to render a judge incompetent. The only exception known to this broad and general rule, exists where there may be a necessity that the judge should act in order to prevent a failure of justice.' After reciting the opinion of Lord Mansfield, in the case of *Hestruph* v. *Braddock,* upon the subject of interest of witnesses and juries, Chief Justice Parsons says: 'It is true he does not comprehend a judge within his general exclusion on account of interest, but there can be no doubt that the principle applies, with equal strength, to them; and we think, for

this cause, *any judgment* rendered by a justice thus circumstanced, might be defeated.   *   *   *'

"We think for the administration of justice, the safe way is, in all cases, for interested judges to decline acting in such cases, and where it appears on the record that they were interested, and acted on questions of fact, and especially when they were to select the jury, who try the facts, they should refuse to sit, and make known their interest at the earliest stage of the proceedings, that the case may, under our statute, be transferred to an adjoining county."

The circumstance of the "town" receiving a moiety (half) of the fines, was the basis of the conclusion of Chief Justice Parker that "any judgments rendered by a justice thus *circumstanced* might be defeated."

In the pending case not only the circumstance of the "town" receiving a moiety of the fine is present, but the further circumstance appears of the "town" giving its mayor the adjunct of a liquor court to be operated by him for the financial benefit of the town, its taxpayers, and all engaged in the work of the court, including the mayor himself.

Mayor Pugh is making a large additional income in fees and costs, in an entirely new class of cases, and his fees and costs, as well as the earnings of the others are dependent on convictions in liquor cases, of which plaintiff's case is one, and the earnings of all are wholly as a result of the adjunct of the liquor court given by the council of his village.

There is enough here even of a pecuniary interest coming to Mayor Pugh, hanging on the event of his decision, that is easily differentiated from that under consideration in the cases holding that court costs are not such a pecuniary interest as will disqualify a judge.

"If difference so vast should pass unobserved by the courts, the bandage upon the eyes of imaged justice would substantially change its symbolic meaning."   (Schauck, J., 72 O. S., 346.)

Mayor Pugh was not only the judge of the law, but of the facts as well, in plaintiff's case. It cannot be claimed that it was necessary for Mayor Pugh to try plaintiff's case in or-

der to prevent a failure of justice, for any village mayor or justice of the peace in the county had the right to try plaintiff's case.

The constitutional means of securing the people in the enjoyment of their inalienable rights is the constitutional grant of remedy by due process of law. Remedy by due process of law is an adjudication by a *qualified* court **proceeding** according to the forms of the law. Instead of this for the enforcement of prohibition we have the *ipse dixit* of the executive head of a force of prohibition officers.

It is as if the chief of police of a city, or the sheriff of a county, was pulling his haul from a drag-net and adjudging the guilt and pronouncing the penalties.

It makes no difference, as a matter of fact, that a mayor must write what he does in a docket, it is his *ipse dixit* nevertheless although covered with a form of judicial procedure. The conclusive proof of this is in the wholesale prostitution of justice that has taken place in these liquor cours **under cover** of enforcing prohibition.

The court's view is that whenever the council of a village, acting under authority of Section 6212-37, *supra*, organizes a force of prohibition officers under its mayor, and puts him to enforcing prohibition co-extensive with the county, that it thereby gives him such an interest in convictions in liquor cases as to disqualify him from sitting in trials of such cases. This disqualifying interest comes from the way he is involved, situated and circumstanced as head of this organization.

One circumstance is the pecuniary benefit that **accrues to** him and all concerned in the work of the court.

Wherefore this court finds Mayor Pugh's conviction of plaintiff null and void and orders plaintiff discharged.